1      UNITED STATES DISTRICT COURT
2       DISTRICT OF PUERTO RICO

3  FAJARDO HOME CARE, INC. et al.,

4   Plaintiffs,

             CIVIL NO. 04-2433 (SEC/JAF)
5   v.

6  MICHAEL O. LEVITT, SECRETARY OF
7  HEALTH AND HUMAN SERVICES,

8   Defendant.

9       **OPINION AND ORDER**

10   Plaintiffs, Fajardo Home Care, Inc., Font Martello Home Care,

11 Inc., El Gigante Home Care, Inc., and Guaynabo Home Care, Inc., a

12 group of Medicare providers, hereinafter collectively referred to as

13 "Providers," bring this action against Defendant, Michael O. Levitt,

14 Secretary of the United States Department of Health and Human

15 Services ("HHS"), hereinafter referred to as "Secretary," pursuant

16 to 42 U.S.C. §1395oo(b) and (f)(1) and 42 C.F.R. § 405.1877. Docket

17 No. 1. Plaintiff Providers request that this court reverse a decision

18 issued by the Provider Reimbursement Review Board ("Board")

19 disallowing the reimbursement of certain expenses incurred by

20 Providers in the conveyance of accounts receivable. Id.; Docket

21 No. 27. Providers also request an award of interest on the amounts

22 in controversy pursuant to 42 U.S.C. 1395oo(f)(2). Docket No. 1.

23 Defendant Secretary moves for judgment on the pleadings pursuant to

Civil No. 04-2433 (SEC/JAF)                                          -2-

F.R.C.P. 12(c).[1] <u>Docket No. 25</u>. Plaintiff Providers oppose. <u>Docket No. 27</u>.

# I.

## Statutory and Regulatory Background

This case arises under Title XVIII of the Social Security Act, hereinafter referred to as the "Medicare Act," 42 U.S.C. §§ 1395 *et seq.* (2003 and Supp. I 2008).  The Medicare Act established a program for the provision of health insurance to the aged and disabled. The Centers for Medicare and Medicaid Services[2] ("CMS"), an operating division of HHS, administers the Medicare program. Fed. Reg. 35437-03 (July 5, 2001); 42 Fed. Reg. 13262-03 (March 9, 1977). Part A of the Medicare Act, 42 U.S.C. §§ 1395c-1395i-5, authorizes payment to providers of home health services, among other types of providers, for the provision of qualified medical services. 42 U.S.C. §§ 1395x(u), 1395c, 1395g. Plaintiff Providers are "home health

---

[1] Although disposition of Providers' appeal is before this court on the Secretary's motion for judgment on the pleadings pursuant to Rule 12(c), this court applies the standard of review found in Section 706 of the Administrative Procedures Act, 5 U.S.C. § 706 (2003), and confines its review to the Board's decision and the administrative record. <u>See</u>, <u>e.g.</u>, <u>Board of Trustee's of State Institutions of Higher Learning v. Sullivan</u>, 763 F.Supp. 178(S.D.Miss.1991); <u>see also</u>, <u>e.g.</u>, <u>Girling Health Care, Inc. v. Shalala</u>, 85 F.3d 211, 214 (5th Cir.1996) (concluding that summary judgment procedure is appropriate in cases where the federal court is asked to review or enforce a decision of a federal administrative agency provided that the court in disposition of the motion does not go beyond the administrative record).

[2] CMS is formerly known as the Health Care Financing Administration. <u>See</u> 66 Fed. Reg. 35437-03 (July 5, 2001), amending 42 Fed. Reg. 13262-03 (March 9, 1977).

Civil No. 04-2433 (SEC/JAF)                                    -3-

1    agencies" and, therefore, "providers of services" within the meaning

2    of 42 U.S.C. 1395x(u).

3         "Fiscal intermediaries" are private entities contracted by CMS

4    to manage medicare payments issued to providers in accordance with

5    the Act, regulations adopted pursuant thereto, and guidelines

6    published by CMS, such as the Medicare Provider Reimbursement Manual

7    ("PRM"). Id. § 1395h; 42 C.F.R. §§ 405.1803(b), 421.5, 421.100 (West,

8    through February 20, 2009). The fiscal intermediary makes interim

9    payments to providers based on an estimation of actual costs. 42

10   U.S.C. § 1395g(a); 42 C.F.R. § 413.64. After the close of a

11   provider's fiscal year, the provider submits an annual cost report

12   to a fiscal intermediary to account for the cost of services

13   allocated to Medicare. 42 C.F.R. § 413.20(b). The fiscal intermediary

14   conducts an audit of the report, determines which costs are

15   "allowable," and, if necessary, makes a retroactive adjustment for

16   overpayment or underpayment. 42 U.S.C. § 1395h, 42 C.F.R.

17   §§ 405.1803(a), 413.64(f). Providers are notified of any retroactive

18   adjustment and monies due or owed through issuance of a Notice of

19   Program Reimbursement ("NPR"). 42 C.F.R. § 405.1803. Future payments

20   to providers may be adjusted to account for past overpayments or

21   underpayments. 42 U.S.C. § 1395g(a); 42 C.F.R. §§ 405.371-73,

22   405.1803(c), 413.64(f).

23        A provider who is dissatisfied with a decision of an

24   intermediary on reimbursement of costs, may appeal to the Board

Civil No. 04-2433 (SEC/JAF)                                    -4-

1    within one-hundred and eighty (180) days after the Intermediary's
2    decision is received. 42 U.S.C. § 1395oo; 42 C.F.R. §§ 405.1835
3    (a)(3), 405.1837.  Groups of providers, such as Plaintiff Providers,
4    may collectively appeal to the Board from an adverse decision of a
5    fiscal intermediary within the same time frame if the controversy
6    involves a common question of fact or interpretation of law or
7    regulations and the total amount in controversy is $50,000 or more.
8    42 U.S.C. § 1395oo; 42 C.F.R. §§ 405.1835(a)(3), 405.1837. Following
9    an administrative hearing, the Board may affirm, modify or reverse
10   an intermediary's determination. 42 U.S.C. § 1395oo(d); 42 C.F.R.
11   § 405.1871(b)(1).

12       "A decision of the Board shall be final . . . unless the
13   Secretary reverses, affirms, or modifies the Board's decision" within
14   sixty (60) days after the provider is notified of the Board's
15   decision.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875 (clarifying
16   that discretionary review by the Secretary is actually conducted at
17   the discretion of the Administrator with assistance from the Office
18   of the Attorney Advisor). A provider may obtain judicial review of
19   the Board's or the Secretary's decision pursuant to applicable
20   provisions of the Administrative Procedure Act ("APA"), 5 U.S.C.
21   § 701 *et seq.* See 42 U.S.C. § 1395oo(f)(1); Board of Trustees of
22   State Institutions of Higher Learning, 763 F.Supp. at 182.

Civil No. 04-2433 (SEC/JAF)                                           -5-

1    **A.   <u>CMS Guidelines for Reimbursement of Costs Incurred in Accounts</u>**
2         **<u>Receivable Financing.</u>**

3         The Secretary has issued "certain interpretations of the

4    governing statutes and regulations in the Provider Reimbursement

5    Manual ("PRM")." <u>Board of Trustees of State Institutions of Higher</u>

6    <u>Learning</u>, 763 F.Supp. at 181; PRM, CMS Pub. 15-1. The PRM specifies

7    the conditions under which certain costs incurred in accounts

8    receivable financing constitute allowable expenses and, therefore,

9    may be reimbursed to providers. PRM, CMS Pub 15-1, Chapter 2.

10   Section 219 of the PRM provides that costs associated with the "sale"

11   of accounts receivable are not allowable expenses:

12                    In accounts receivable financing, the
13               intermediary must first determine if the
14               arrangement represents a sale of receivables or
15               if it is a loan. If it is a loan, interest
16               incurred on the loan is an allowable expense if
17               it is necessary and proper as defined in
18               §§ 202.1, 202.2 and 202.3. The interest on the
19               loan is the discount on the advance on the
20               receivables (*e.g.*, 10 percent where a provider
21               receives 90 cents on the dollar).

22               <u>If the intermediary determines that the</u>
23               <u>arrangement is a sale</u>, *the costs associated with*
24               *the sale are not allowable expenses*. The
25               provider has opted to receive payment prior to
26               collection on the accounts.
27
28   <u>Id.</u> §219 (emphasis supplied). The Medicare Act, regulations adopted

29   pursuant thereto, or the PRM do not define what constitutes a "sale"

30   of accounts receivable, however. The PRM does state that "for any

31   cost situation that is not covered by the manual's guidelines and

32   policies, generally accepted accounting principles should be

1    applied." PRM, CMS Pub. 15-1, Chapter 1, at__I; AR, at 104-105.

2    Toward that end, Financial Accounting Standard ("FAS") 125, issued

3    by the Financial Accounting Standards Board ("FASB"), provides that

4    "a transfer of financial assets in which the transferor surrenders

5    control over those financial assets shall be accounted for as a sale

6    to the extent that consideration other than beneficial interests in

7    the transferred assets is received in exchange." AR, at 30 (emphasis

8    supplied). Under FAS 125, the transferor is deemed to have

9    "surrendered control" over transferred assets if all of the following

10   conditions are met:

11          A.   The transferred assets have been isolated
12               from the transferor - put presumptively
13               beyond the reach of the transferor and its
14               creditors, even in bankruptcy or other
15               receivership;

16          B.   Either (1) each transferee obtains the
17               right — free of conditions that constrain
18               it from taking advantage of that right to
19               pledge or exchange the transferred assets
20               or (2) the transferee is a qualifying
21               special-purpose entity and the holders of
22               beneficial interests in that entity have
23               the right — free of conditions that
24               constrain them from taking advantage of
25               that right — to pledge or exchange those
26               interests; and

28          C.   The transferor does not maintain effective
29               control over the transferred assets through
30               (1) an agreement that both entitles and
31               obligates the transferor to repurchase or
32               redeem them before their maturity, or (2)
33               an agreement that entitles the transferor
34               to repurchase or redeem transferred assets
35               that are not readily obtainable.

1    Id.

2                                    **II.**

3                    **Factual and Procedural Background**

4          As   required,   we   derive   the   following   facts   from   the

5    Administrative Record. Each Provider entered into an Agreement for

6    Funding  of  Healthcare  Receivables  ("Agreement")  with  MedCapital

7    Funding I, Corp. ("MedCap") to obtain financing through the transfer

8    of certain healthcare receivables. AR, at 1390. Paragraph 10.04 of

9    the Agreement states that the Provider, "[u]pon giving thirty (30)

10   days written notice . . . shall have the right to repurchase all, <u>but</u>

11   <u>not less than all</u> of the Healthcare Receivables for a Repurchase

12   Price  equal  to  the  then  outstanding  principal  amount  of  the

13   proceeds." AR, at 243, 446 (emphasis supplied). The Agreements are

14   governed by the laws of the State of Texas. AR, at 245 and 448. Each

15   Provider also entered into an agreement ("MedCare Agreement") with

16   MedCare Financial Solutions, Inc. ("MedCare"), under which MedCare

17   is obligated to take over the preparation, filing, and management of

18   Medicare  claims  on  the  accounts  receivable  transferred  under  the

19   Agreement. AR, at 1814. As of the effective date of the MedCare

20   Agreement, MedCare controlled when the accounts receivable would be

21   billed to MedCap. AR, at 89.

22         Providers submitted annual cost reports to Blue Cross and Blue

23   Shield  Association  for  United  Government  Services  ("UGS"),  the

24   designated  fiscal  intermediary,  claiming  the  following  interest

1    expense associated with the transfer of accounts receivable under the

2    Agreements:

3            (1)       Guaynabo Home Care, Inc., Inc.     $277,697.00

4            (2)       Font Martello Home Care, Inc.      $1,523.00

5            (3)       Fajardo Home Care, Inc.            $25,256.00

6            (4)       El Gigante Home Care, Inc.         $24,097.00

7    AR, at 1390. UGS audited the Providers cost reports and disallowed

8    the above-listed expense. AR, at 12. UGS based its decision on a

9    determination that the aforementioned transaction constituted a

10   "sale" of Providers' accounts receivable under § 219 of the PRM and

11   FAS 125, for which associated costs are not eligible for

12   reimbursement from Medicare.  Id.

13       Providers appealed UGS' disallowance of claimed interest expense

14   to the Board. AR, at 1767. On January 28, 2004, the Board held a

15   hearing on the limited issue of whether or not the Agreements For

16   Funding of Healthcare Receivables constitute a "sale" of accounts

17   receivable. AR, at 11-15. During the hearing, the Intermediary relied

18   on § 219 of the PRM, CMS Pub. 15-1, and FAS 125 to support its

19   contention that the Providers' Agreements constitute a "sale" of

20   accounts receivable because under the Agreements, Providers

21   "surrendered control" of the accounts receivable.  AR, at 13.

22       Both the Intermediary and the Providers proffered testimony at

23   hearing regarding the three criteria in FAS 125. The Providers argued

24   that the accounts receivable were not in fact "isolated" so as to be

Civil No. 04-2433 (SEC/JAF)                                      -9-

1    put "presumptively beyond the reach of Providers and its creditor in

2    the event of bankruptcy," as required under para. "A."  AR, at 14.

3    In response, the Intermediary argued that the requirements of para.

4    "A" were met because "the Agreement gives MedCap the exclusive right

5    to purchase the receivables and the Providers agree to sell,

6    transfer, assign and convey all their right, title and interest in

7    the receivables."  AR, at 13.

8         Providers argued that the requirements of para. "B" were met

9    because their right to repurchase the accounts receivable under

10   paragraph 10.04 survived assignment and, therefore, MedCapital

11   Funding I, Corp. did not obtain the accounts receivable free and

12   clear, as required under para. "B." AR, at 14. In response, the

13   Intermediary argued that the requirements of para. "B" were met

14   because "the Agreement does not prohibit MedCap from pledging or

15   exchanging the transferred assets." AR, at 13.

16        The Providers argued that the Agreement did not meet the

17   requirements of para. "C" because Providers did not relinquish

18   "control" with an option to repurchase not less than all of the

19   accounts receivable upon the provision of 30 days notice.  AR, at 14.

20   In response, the Intermediary argued that para. "C" is met because

21   no provision within the Agreement "both entitles and obligates the

22   Providers to repurchase the receivables as described in paragraph

23   'C.'"  AR, at 13.

Civil No. 04-2433 (SEC/JAF)                                        -10-

1       UGS's Audit Manager, Mr. Lukac, and MedCap's CPA, Mr. James,

2   provided testimony during the hearing. On behalf of the Intermediary,

3   Mr. Lukac testified that Medicare made up ninety percent (90%) of the

4   Providers' business and opined that the thirty-day notice requirement

5   under Paragraph 10.04 made the repurchase option ineffective because

6   Medicare claims are usually paid within fourteen (14) days of

7   submission. Id., at 107. On behalf of the Providers, Mr. James

8   testified that even if the date of billing for transferred

9   receivables was immediately after the date of the assignment, it was

10  still possible that payment would extend beyond the 30-day period

11  provided for under Paragraph 10.04. AR, at 90. Notably, no one

12  offered evidence at the hearing to establish the dates on which

13  MedCare actually billed claims for reimbursement on the transferred

14  accounts.  Docket No. 27, at 6.

15      On October 29, 2004, the Board issued its decision upholding the

16  Intermediary's decision to disallow the claimed interest expense.

17  AR, at 11-15 ("the Intermediary's adjustments disallowing the

18  Providers' interest expense were proper and affirmed"). In its

19  decision, the Board reasoned that although the Agreements included

20  a thirty-day buyback provision, "the requirements of that section

21  leave the providers with no real control over the receivables, as the

22  record established that most, if not all, of the receivables are

23  liquidated within 14 days of billing." AR, at 14. The Board concluded

24  that the Providers could not exercise their right to repurchase "all

Civil No. 04-2433 (SEC/JAF)                                          -11-

1    but not less than all" of the accounts receivable because at least

2    a portion of the receivables would in effect cease to exist before

3    expiration of the thirty-day notice period.

4              By the terms of the MedCap agreements, the
5              Providers <u>surrendered control</u> over the financial
6              assets in consideration of payments made at the
7              time of acquisition. While Section 20.04 of the
8              MedCap agreement does permit the Providers, upon
9              30 days written notice, to repurchase all but
10             not less than all of the receivables, the
11             requirements of that section leave the providers
12             *with no real control* over the receivables, as
13             the record established that most, if not all, of
14             the receivables are liquidated within 14 days of
15             billing. The Intermediary witness testified that
16             approximately 90 percent of the Providers'
17             business was Medicare related, and Medicare
18             generally pays clean claims in 14 days. As a
19             result, the Providers cannot effectively
20             exercise an option to repurchase all but not
21             less than all of the receivables when the
22             Providers must give a full 30-day written
23             notice.

24   <u>Id.</u> (emphasis suppled).
25
26        Providers pursued all available avenues of appeal from the

27   Board's decision. On November 3, 2004, Providers submitted a *Request*

28   *For Review of Provider Reimbursement Review Board Decision By*

29   *Administrator,* which the Administrator declined to review. AR, at 01-

30   07. On December 28, 2004, Providers filed their complaint in this

31   court, requesting a reversal of the Board's decision to uphold the

32   intermediary's (UGS's) disallowance of Providers' claimed costs.

33   <u>Docket No. 1</u>. The issue before this court is limited to whether or

34   not the transaction embodied in the Agreement constitutes a sale of

Civil No. 04-2433 (SEC/JAF)                                      -12-

1    accounts receivable for which expenses are not reimbursable under the
2    Medicare program.

3         On April 28, 2005, this court ordered Defendant to file its
4    Memorandum of Law in support of Defendant's Answer within sixty days
5    and Plaintiff to file a Reply Memorandum within sixty days after
6    defendant's filing. Docket No. 20. On June 28, 2005, Defendant
7    Secretary filed the *Secretary's Motion For Judgment on The Pleadings*
8    *and Memorandum Of Law In Support Thereof* pursuant to Fed. R. Civ.
9    P. 12(c). Docket No. 25; supra, note 1. On August 5, 2005, Plaintiffs
10   filed *Plaintiffs' Memorandum of Law in Reply to Defendant's Motion*
11   *for Judgment on the Pleadings and Memorandum of Law in Support*
12   *Thereof*. Docket No. 27.

13        As a preliminary matter, the fleeting analysis in the Board's
14   decision leaves this court with the impression that the Board did not
15   analyze the available facts against the three criteria in FAS 125 in
16   considerable detail, or at least in its written decision. Rather, it
17   appears that the Board engaged in a threshold inquiry as to whether
18   or not the Providers "surrendered control" of the accounts
19   receivable. Although both parties provided testimony relative to the
20   criteria in paragraphs A, B and C of FAS 125, the Board's two-
21   paragraph, eight-sentence analysis offers little in return. AR, at

Civil No. 04-2433 (SEC/JAF)                                    -13-

1    14. The Board's macro-analysis and its failure to cite[3] to record

2    evidence greatly frustrated this court's review. Unfortunately for

3    Providers, as a general rule, if an agency happens to issue a

4    decision with "'less than ideal clarity,' a reviewing court is not

5    to upset the decision on that account 'if the agency's path may

6    reasonably be discerned.'" Alaska Dept. Of Environmental Conservation

7    v. E.P.A., 540 U.S. 461, 497, 124 S.Ct. 983 (2004) (quoting Bowman

8    Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281,

9    286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

10    **III.**

11    **Analysis**

12    **A.  Standard of Judicial Review**

13    Judicial review of final decisions issued by the Board or the

14    Secretary "is governed by 42 U.S.C. 1395oo(f), which incorporates the

15    standards of Section 706 of the Administrative Procedure Act ("APA"),

16    5 U.S.C. §706." Board of Trustees of State Institutions of Higher

17    Learning, 763 F.Supp. at 184. The APA requires a reviewing court "to

18    set aside agency action, findings and conclusions found to be

19    'arbitrary, capricious and an abuse of discretion, or otherwise not

---

[3] Having reviewed the Board's decision, this court is compelled to refer the Board to 42 C.F.R. § 405.1871(a)(4), which states that Board decisions "must include appropriate citations to the record evidence and to the applicable law, regulations, CMS Rulings, and other interpretive rules, general statements of policy, and rules of agency organization, procedure or practice established by CMS." 42 C.F.R. § 405.1871(a)(4)(emphasis supplied).

1   in accordance with law' or 'unsupported by substantial evidence.'"

2   Id. (citing 5 U.S.C. 706(2)). In reviewing an agency action under the

3   APA, the agency's action is presumed to be valid and the court will

4   not substitute its judgment for that of the agency. Rivera v.

5   Mueller, 2009 WL 303050, *6 (N.D.Ill.). The court's analysis is

6   limited to determining whether or not the agency's decision is

7   "within the bounds of reasoned decisionmaking." Baltimore Gas & Elec.

8   Co. v. Natural Resources Defense Council, 462 U.S. 87, 105, 103 S.Ct.

9   2246, 76 L.Ed.2d 437 (1983).

10       In reviewing issues of law, courts must defer to an

11   administrative agency's "reasonable interpretation" of its governing

12   statute, Northwest Environmental Advocates v. U.S. E.P.A., 537 F.3d

13   1006, 1020 (9th Cir.2008); that interpretation is entitled to

14   "substantial deference." Connecticut Department of Income Maintenance

15   v. Heckler, 471 U.S. 524, 532, 105 S.Ct. 2210, 2214, 85 L.Ed.2d 577

16   (1985). Similarly, an agency's interpretation of regulation that it

17   promulgates is entitled to "great deference and must be upheld unless

18   it is so plainly erroneous or so inconsistent with either the

19   underlying regulation or statute as to be arbitrary, capricious, an

20   abuse of discretion or otherwise not in accordance with law." State

21   of Georgia ex rel. Department of Medical Assistance v. Heckler, 768

22   F.2d 1293, 1298 (11th Cir.1985), cert. denied, State of Georgia ex

23   rel. Department of Medical Assistance v. Bowen, 474 U.S. 1059, 106

Civil No. 04-2433 (SEC/JAF)                                    -15-

1    S.Ct. 803, 88 L.Ed.2d 779 (1986); <u>South Georgia Natural Gas Co. V.</u>

2    <u>F.E.R.C.</u>, 699 F.2d 1088, 1090 (11th Cir.1983).

3        Under the substantial evidence standard, agency decisions are

4    "presumed valid" and the process by which such decisions are reached

5    is accorded great deference. <u>Duckworth v. U.S.</u>, 2006 WL 753081, *2.

6    "Substantial evidence means such relevant evidence as 'a reasonable

7    mind might accept as adequate to support a conclusion.'" <u>Id.</u> (quoting

8    *Steadman v. SEC*, 450 U.S. 91, 99, 101 S.Ct. 999, 67 L.Ed.2d (1981)).

9    Reviewing courts should not disturb the judgment of an administrative

10   tribunal and an agency's endorsement of that judgment "so long as the

11   findings are adequately anchored in the record." <u>Id.</u>, 2006 WL

12   753081,*2.

13   **B.   <u>Whether The Board's Findings Are Supported By Substantial</u>**
14        **<u>Evidence.</u>**

15       The Board's brief analysis classifies the Providers' accounts

16   receivable transaction as a "sale" based on a threshold finding under

17   FAS 125 that Providers "surrendered control" of accounts receivable

18   transferred to MedCap. AR, at 12. Providers argued at hearing before

19   the Board and again before this court that they did not "surrender

20   control" because they held an option to repurchase upon giving thirty

21   days written notice. In response, the Secretary argues, in line with

22   the testimony of Mr. James, that Providers would really be unable to

23   repurchase "all but not less than all" of the accounts receivable

24   upon giving thirty days written notice since "Medicare pays clean

1    claims generally in 14 days" and the claims at issue were Medicare

2    eligible. AR, at 107. The Board would appear to adopt the position

3    of the Intermediary, concluding that "Providers surrendered control"

4    because "Providers cannot effectively exercise an option to

5    repurchase "all but not less than all" of the receivables when the

6    Providers must give a full 30-day written notice" and "Medicare

7    generally pays clean claims in 14 days." AR, at 12. These

8    circumstances, the Board contends, "leave the Providers with no real

9    control." AR, at 12.

10   Providers now argue on appeal that the Board made the wrong

11   evidentiary inquiry. Specifically, Providers contend that to render

12   the Providers' option to repurchase under Paragraph 10.04

13   "meaningless," the relevant evidentiary inquiry is not whether

14   "Medicare generally pays clean claims in 14 days," but rather,

15   whether the healthcare receivables are submitted to and paid by

16   Medicare within 14 days of assignment. Docket Nos. 1 and 27 (emphasis

17   supplied). Providers' point is well-taken. Indeed, if Medicare pays

18   claims within fourteen days, a Provider might successfully exercise

19   their option to repurchase all but not less than all of the accounts

20   receivable if they give 30-day written notice at least a few weeks

21   prior to the date upon which MedCare submits claims on those the

22   transferred accounts. While this court understands the Providers'

23   preoccupation with the timing of claims billed and paid, this court

24   is not in a position to second-guess the judgment of the Board. The

1    court's review under the substantial evidence standard is limited to

2    ensuring that the Board's findings are "adequately anchored in the

3    record." <u>Duckworth v. U.S.</u>, 2006 WL 753081, *2. The Board reached a

4    conclusion that the Providers "surrendered control," in part, based

5    on a finding that Medicare generally pays clean claims in fourteen

6    (14) days. The Intermediary clearly provided testimony that Medicare

7    pays claims generally within fourteen days. AR, at 107.

8         Moreover, the record reflects that MedCare, not the Providers,

9    had control over when claims on the transferred accounts were billed,

10   making the Providers' ability to successfully exercise their option

11   pursuant to Paragraph 10.04 more a matter of chance than will.

12   Although this fact is not expressly mentioned in the Board's

13   decision, it is a fact in the record that may have influenced the

14   Board's ultimate decision as to whether the Providers "surrendered

15   control" of the accounts receivable. For the above reasons, this

16   court finds the Board's decision to be supported by substantial

17   evidence.

18   **C.   <u>Whether The Board's Finding That Providers Surrendered Control</u>**
19        **<u>Over The Accounts Receivable Is Made In Accordance With The Law</u>**
20        **<u>And Supported By Substantial Evidence.</u>**
21
22        Providers contend that the Board erred in classifying the

23   accounts receivable transaction as a "sale" under FAS 125 because the

24   decision is based on "an incorrect interpretation of the law as it

25   applies to the facts of this case." <u>Docket Nos. 1 and 27</u>.

26   Specifically, Providers argue that the Board did not properly

Civil No. 04-2433 (SEC/JAF)                                              -18-

1    consider applicable provisions of the bankruptcy code in its analysis

2    of the criteria in paragraph "A" of FAS 125 and did not interpret

3    Paragraph 10.04 pursuant to the principles of contract construction.

4        **1.    Whether The Board Correctly Interpreted And Applied**
5             **Applicable Provisions Of The Bankruptcy Code.**

6            Providers contend that they did not "surrender control" of the

7    accounts receivable because the accounts receivable were not

8    "isolated" so as to be "put presumptively beyond the reach of the

9    transferor [Providers] and its creditors, even in bankruptcy," a

10   requirement of paragraph "A" in FAS 125. Docket No. 27, at 8; FAS

11   125(A). This court agrees with Providers' assessment of the

12   Bankruptcy Code, but not their application. Under the Bankruptcy

13   Code, upon the filing of a bankruptcy petition by a Provider, an

14   estate would be created consisting, in part, of "all legal and

15   equitable interest of the debtor in a property." 11 U.S.C.

16   § 541(a)(1). Creditors would be entitled to file claims against an

17   estate of the Provider. Id. § 501(a). Furthermore, upon the filing

18   of a petition, a stay would be effected of "any act to obtain

19   possession of property of the estate or of property from the estate

20   or to exercise control over property of estate." Id. § 362(a)(3).

21   Clearly, rights arising in contract, such as the Providers' right to

22   repurchase arising under Paragraph 10.04, are property rights that

23   may, upon the filing of a petition, be included in a Provider's

24   estate.

1    Providers assert that their right to repurchase the accounts
2    receivable upon giving thirty days written notice pursuant to
3    Paragraph 10.04 would, "upon the filing of a bankruptcy petition,
4    make all accounts receivable a part of the Debtor/Provider's
5    bankruptcy estate" and, therefore, the accounts receivable would not
6    in effect be "isolated" from Providers or their Creditors. Docket
7    No. 27, at 10. To the extent that Providers contend the accounts
8    receivable would be included in the bankruptcy estate, this court
9    must disagree. The property right subject to the claims of creditors
10   in a bankruptcy proceeding cannot exceed the right held by the
11   debtor. The "property right" at issue here is a Provider's right to
12   repurchase not less than all of the accounts receivable upon giving
13   thirty days written notice. Contrary to Providers' assertion, it is
14   not the accounts receivable, but rather, the right to repurchase
15   those receivables, that would be subject to inclusion in a bankruptcy
16   estate. See also, e.g., In re Stevens, 374 B.R. 31 (D.N.H.2007)
17   (holding that residence was not property of the bankruptcy estate but
18   debtors state law statutory right to repurchase residence was an
19   interest in property that they had on petition date, and that did
20   become "property of the estate").

21   The Board determined that Providers had no "real control" over
22   the accounts receivable and, therefore, effectively "surrendered
23   control" upon execution of the Agreement. Having considered the
24   record in its entirety, this court finds the Board's decision to be

Civil No. 04-2433 (SEC/JAF)                                    -20-

1    reasonable. Creditors would inevitably succeed to the same right held

2    by   Provider-debtors   in   the   event   of   bankruptcy.   That   right   to

3    repurchase,   if   claimed,   would,   therefore,   also   be   <u>presumptively</u>

4    beyond   the   reach   of   creditors.   This   court   finds   the   Board's

5    determination to be in accordance with the Code and within the bounds

6    of reasoned decision-making.

7         **2.    <u>Whether The Board's Interpretation of Paragraph 10.04 Is</u>**
8              **<u>In Accord With Principles of Contract Construction.</u>**
9
10        Providers   argue   under   the   principles   of   contract   construction

11   that the Board misinterpreted the operation of Paragraph 10.04 and,

12   consequently,   erred   in   determining   that   the   accounts   receivable   were

13   "isolated   from   the   transferor   .   .   .   beyond   the   reach   of   the

14   transferor and its creditors, even in bankruptcy." <u>Docket No. 27, at</u>

15   <u>13-14</u>. Paragraph 10.4 provides:

16                  Upon giving thirty (30) days written notice to
17                  MEDCAPITAL,   PROVIDER   shall   have   the   right   to
18                  repurchase all, but not less than all, of the
19                  Healthcare   Receivables   for   a   Repurchase   Price
20                  equal to the then outstanding principal amount
21                  of the proceeds.

22        Providers   argue   that   the   Board   interpreted   Paragraph   10.04

23   incorrectly. The Providers would interpret Paragraph 10.04 such that

24   the "then outstanding principal amount" relates to the date of the

25   notice,   securing   a   right   to   repurchase   the   outstanding   accounts

26   receivables that exist on the date of notice. <u>Docket No. 27, at 13</u>.

27   This   interpretation   would,   of   course,   make   it   more   feasible   for

28   providers to exercise their option to repurchase "all but not less

1    than all" of the accounts receivable because MedCare would have less

2    time to submit and receive payment for claims submitted on the

3    transferred accounts.

4        This court can only presume from the Board's decision that it

5    would advocate for an interpretation of Paragraph 10.04 that relates

6    the "then outstanding principal amount" to the amount in existence

7    at the end of the thirty-day notice period. This interpretation

8    would, of course, diminish the Providers' ability to repurchase not

9    less than all of the accounts receivable, because MedCare would have

10   more time during which to bill and receive payment for claims

11   submitted on the transferred accounts.

12       Providers assert that their interpretation is correct and should

13   be adopted because the alternative would render Paragraph 10.04

14   meaningless. Docket No. 27, at 13, 14. It is well-established that

15   contracts should be construed so as to give all provisions meaning

16   and allow for the possibility of performance. Coker v. Coker, 650

17   S.W.2d 391, 393; Republic National Bank of Dallas v. Northwest

18   National Bank of Fort Worth, 578 S.W.2d 109, 115 (Tex 1978). But, in

19   this case, under the Board's interpretation of Paragraph 10.04, it

20   is not clear that Paragraph 10.04 would be rendered meaningless or

21   ineffective. The Board's interpretation would, however, make the

22   option to repurchase no less than all of the accounts receivable

23   exceedingly difficult to exercise and ultimately contingent upon the

24   timing of actions performed by third-parties (e.g., MedCare and CMS

1   claims Dept.). It is discernable under these facts how the Board

2   might have concluded that the Providers "surrendered control" of the

3   accounts receivable. As such, this court defers to the Board's

4   interpretation of Paragraph 10.04.

5                                **IV.**

6                            **<u>Conclusion</u>**

7       For the foregoing reasons, this court finds on the record before

8   it, that the decision of the Board is supported by substantial

9   evidence, and made in accordance with the law. Accordingly, the court

10  hereby **AFFIRMS** the decision of the Board. Case closed.

11      **IT IS SO ORDERED.**

12      San Juan, Puerto Rico, this 16th day of March, 2009.

13                                  s/José Antonio Fusté
14                                  JOSE ANTONIO FUSTE
15                                  Chief U.S. District Judge
16